



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 10, 2021**

*Mark X. Mullin*
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| RAY DOUGLAS GRIFFITH, | § | CASE NO. 19-44562-MXM-13 |
| | § | |
| DEBTOR. | § | CHAPTER 13 |
| | § | |

| | | |
|---|---|---|
| | § | |
| RAY DOUGLAS GRIFFITH, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | ADVERSARY NO. 20-4038-MXM |
| | § | |
| LONE STAR, FLCA AND | § | |
| CRYSTAL MATULICH, | § | |
| | § | |
| DEFENDANTS. | § | |

### MEMORANDUM OPINION
*[Relates to Adv. ECF Nos. 1, 15, 29]*

The Court held a trial to liquidate all claims between Plaintiff Ray Douglas Griffith ("***Mr.***

***Griffith***") and Defendants Lone Star, FLCA ("***Lone Star***") and Crystal Matulich ("***Ms.***

***Matulich***").

## I.     SUMMARY OF THE DISPUTE

Mr. Griffith defaulted on his mortgage loan to Lone Star and filed Chapter 13 bankruptcy to stave-off foreclosure of the real property securing the loan. The Court dismissed Mr. Griffith's Chapter 13 bankruptcy because he failed to file required documents. Mr. Griffith filed a motion to reinstate his bankruptcy case. But before Mr. Griffith's bankruptcy case was reinstated, Lone Star foreclosed and sold the property to Ms. Matulich, a third-party buyer with the highest bid at the foreclosure auction.

Through the Complaint,[1] Mr. Griffith seeks to either void the foreclosure sale or recover damages through various legal claims under the Bankruptcy Code and Texas law, alleging (among other things) that Lone Star did not provide proper notice of the foreclosure sale. After a round of summary-judgment motions, Mr. Griffith's two surviving claims are breach of contract and wrongful foreclosure.

The Court has considered the pleadings and other papers filed in this adversary proceeding and in the bankruptcy case, the testimony of witnesses, the exhibits admitted into evidence, and the arguments of counsel. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law[2] as required by Federal Rule of Civil Procedure 52, made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.

For the reasons explained below, the Court finds and concludes that Mr. Griffith failed to establish an essential element of each surviving cause of action, so his claims for breach of contract and wrongful foreclosure against Lone Star and Ms. Matulich fail and are hereby dismissed.

---

[1] *Debtor-Plaintiff's Original Complaint Against Lone Star ACA [sic] and Crystal Matulich*, Adv. ECF No. 1 (the "***Complaint***").

[2] Any findings of fact that should more appropriately be characterized as a conclusion of law should be regarded as such, and *vice versa*.

## II.    JURISDICTION AND VENUE

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (F), (H), and (O).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).  The Court has constitutional and statutory authority to enter a final judgment in this matter.

## III.    FINDINGS OF FACT[3]

### A.  Mr. Griffith's Property and Loan from Lone Star

In 2001, Mr. Griffith purchased approximately 97 acres of land in Cisco, Texas located on County Road 228.[4]  On December 8, 2005, Mr. Griffith purchased an additional approximately 99 acres of contiguous land on Farm Road 569.[5]  To finance the 2005 purchase of the Farm Road 569 property, Mr. Griffith obtained a loan from Lone Star Land Bank, FLCA, predecessor-in-interest to Lone Star, and executed a Promissory Note in the principal amount of $137,500.00 (the "*Note*").[6]  To secure repayment of the Note, Mr. Griffith also executed a Deed of Trust (the "***Deed of Trust***")[7] granting a lien on both the County Road 228 property and the Farm Road 569 property (together, the "***Property***").

Because the central issue in this dispute is whether Lone Star provided Mr. Griffith proper notice of a foreclosure sale that took place in January 2020—fifteen years after the Note and Deed of Trust were executed—the relevant notice provisions in the loan documents are extremely relevant.

---

[3] Citations to "SF ¶" are to the "Stipulated Facts" in the *Joint Pretrial Order*, Adv. ECF No. 101.  Citations to witnesses' testimony will include the witness's last name, testimony transcript abbreviated "Test. Tr.," Adv. ECF Number, and pinpoint citations as "[page number]:[line number(s)]."

[4] Griffith Test. Tr., Adv. ECF No. 118, at 10:2-8.

[5] *Id.* at 19:18-25.

[6] LS Ex. 1 at 1.

[7] LS Ex. 2 at 2.

### 1. The "Notice" provisions in the Note

The Note provides on page one that "BORROWER'S NAME AND ADDRESS" is "Ray Griffith, 5112 Geddes Avenue, Ft. Worth, TX 76107"[8] (the "***Geddes Address***").

Page two of the Note includes a "NOTICE" provision that provides:

> Unless otherwise required by law, any notice to me shall be given by delivering it or by mailing it by first class mail addressed to me at my last known address within 30 days of the change.  I agree to inform you in writing of any change in my address. I will give any notice to you by mailing it first class to your address stated on page 1 of this agreement, or to any other address that you have designated.[9]

### 2. The "Notice" provisions in the Deed of Trust

Like the Note, page one of the Deed of Trust provides: "GRANTOR: Ray Griffith . . . a single person whose address is 5112 Geddes Avenue, Ft. Worth, Texas 76107."[10]

Page six, paragraph 27 of the Deed of Trust includes a "NOTICE" provision that provides:

> Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing.  Notice to one grantor will be deemed to be notice to all grantors.[11]

## B.  Mr. Griffith's Note Delinquencies and Changes of Address From 2005 Through 2020

From 2005 until sometime in 2007, Mr. Griffith was single and lived at the Geddes Address.[12]  In 2007, Mr. Griffith began living at 2916 Sanguinet, Fort Worth, Texas 76107 (the "***Sanguinet Address***"), where he then lived with his spouse.[13]

---

[8] LS Ex. 1 at 1.

[9] *Id*. at 2.

[10] LS Ex. 2 at 1.

[11] *Id*. at 6.

[12] Mr. Griffith acquired the Geddes Address property in 1984 and he continues to own the Geddes Address property. Griffith Test. Tr., Adv. ECF No. 118, at 6:2-4, and at 155:12-19.

[13] *Id.* at 8:9-25.

4

### 1. *March 26, 2014—Change of Address to the Sanguinet Address*

Lone Star contends that on March 26, 2014, Mr. Griffith telephoned Lone Star to change his notice address from the Geddes Address to the Sanguinet Address.[14]  In support of Lone Star's contention, Mr. Gerrit Schouten ("*Mr. Schouten*"), Lone Star's credit office president, testified that Lone Star's business records contain a *Loan System Management Change*[15] dated March 26, 2014, which is an internal document created in the ordinary course of Lone Star's business to effect changes in its loan maintenance system resulting from oral changes requested by customers that were made either in person at a branch location or by telephone.[16]  Based on the *Loan System Management Change*, Lone Star changed Mr. Griffith's notice address in its loan maintenance system from the Geddes Address to the Sanguinet Address and began sending all correspondence, monthly statements, and any other notices to the Sanguinet Address beginning on March 26, 2014.[17]

Mr. Griffith denies that he made any such oral request in 2014 for Lone Star to change his address from the Geddes Address to the Sanguinet Address.[18]  However, Mr. Griffith admitted in his testimony that at some point prior to 2016, he began receiving correspondence, monthly statements, and other notices from Lone Star at his Sanguinet Address.[19]  At no time in 2014 or thereafter, however, did Mr. Griffith ever raise any concerns to Lone Star that he was receiving mail from Lone Star at his Sanguinet Address rather than at his Geddes Address.[20]

---

[14] Schouten Test. Tr., Adv. ECF No. 119, at 12:22-16:20.

[15] LS Ex. 20 at 1.

[16] Schouten Test. Tr., Adv. ECF No. 119, at 13:5-15:15.

[17] *Id.* at 16:17-20.

[18] Griffith Test. Tr., Adv. ECF No. 118, at 77:4-78:1, and at 79:23-80:4.

[19] *Id.* at 78:2-6.

[20] *Id.* at 45:23-25, and at 53:15-54:6.

The Court finds the testimony of Mr. Schouten and the corroborating *Loan System Management Change* business record that was created at that time more persuasive than Mr. Griffith's testimony that he did not make the oral change of address in 2014.

### 2. April 6, 2016—Mr. Griffith Cures Note Delinquency and Establishes an Online Banking Account

Sometime prior to April 6, 2016, Mr. Griffith fell behind on his Note obligation to Lone Star.[21] On or about April 6, 2016, Mr. Griffith decided to cure his Note delinquency and to sign up for online banking in Lone Star's Cardinal loan accounting system, which would allow him to make his Note payments online.[22] Therefore, Mr. Griffith sent a hand-written cover letter to Lone Star enclosing (i) check #4114 to bring his Note obligation current, and (ii) a voided check and an executed *Electronic Fund Transfer Authorization and Agreement* to enable Mr. Griffith to establish his online banking account.[23] Although Mr. Griffith was setting up online banking for his account, he confirmed in his cover letter that that he still wanted to receive his monthly invoices by mail.[24] Mr. Griffith signed his hand-written note and included his cell phone number and his Sanguinet Address.[25]

Mr. Griffith testified that his hand-written note was intended, in part, to be his "written instruction . . . that instructs Lone Star to send mail to 2916 Sanguinet,"[26] as required by the Note and Deed of Trust, but Mr. Griffith's testimony was not persuasive or credible on this point. Rather, the credible evidence suggests that Mr. Griffith's hand-written note was intended to serve

---

[21] *Id.* at 44:25-45:5.

[22] Pl.'s Ex. 22, at 2; *see also* LS Ex. 19, at 2; Griffith Test. Tr., Adv. ECF No. 118, at 43:12-44:20; *see also* Schouten Test. Tr., Adv. ECF No. 119, at 31:5-12.

[23] Pl.'s Ex. 22, at 2; *see also* LS Ex. 19, at 2; Griffith Test. Tr., Adv. ECF No. 118, at 43:12-44:20.

[24] Griffith Test. Tr., Adv. ECF No. 118, at 43:12-44:20.

[25] *Id.*

[26] *Id.* at 46:3-10.

as a cover letter for the enclosed check #4114 to bring his Note obligation current.  That hand-written note, together with the voided check and executed *Electronic Fund Transfer Authorization and Agreement*, were simply the documents required by Lone Star to enable Mr. Griffith to establish his online banking account.  And Mr. Griffith's cover-letter statement, "I would still like to receive the Invoice monthly by mail,"[27] supports the finding that Mr. Griffith had previously orally requested that his invoices be sent to the Sanguinet Address and that he still wanted his invoices mailed each month to the Sanguinet Address even though he was establishing an online banking account.

### 3. *Mr. Griffith's Note Becomes Chronically Delinquent in 2018, and Lone Star Accelerates the Note in March 2019*

Beginning in 2017 and continuing through December 2018, Mr. Griffith made sporadic and untimely payments on his Note to Lone Star.[28]  In fact, the last payment Mr. Griffith has made on the Note was in December 2018.[29]  As a result of Mr. Griffith's payment defaults, Lone Star sent at least four *Notice of Default and Notice of Acceleration* letters to Mr. Griffith at the Sanguinet Address between May 17, 2018 through March 1, 2019.[30]

On April 3, 2019—in connection with the March 1, 2019 *Notice of Default and Notice of Acceleration*—Lone Star sent to Mr. Griffith a *Notice of Acceleration and Intent to Foreclose*.[31] This notice was also sent to the Sanguinet Address.[32]

---

[27] Pl.'s Ex. 22, at 2; *see also* LS Ex. 19, at 2.

[28] Schouten Test. Tr., Adv. ECF No. 119, at 10:16-22.

[29] *Id.* at 19:17-23.

[30] LS Exs. 3, 4, 5, and 6; *see also* Schouten Test. Tr., Adv. ECF No. 119, at 18:17-21:4.

[31] LS Ex. 7; *see also* Schouten Test. Tr., Adv. ECF No. 119, at 21:12-22:1.

[32] LS Ex. 7.

### 4. Mr. Griffith's April 23, 2019 Text Messages with Mr. Schouten and the Subsequent Change of Address to Mr. Griffith's PO Box

After Lone Star sent Mr. Griffith the April 3, 2019 notice of acceleration and intent to foreclose, Mr. Schouten left Mr. Griffith several telephone voicemail messages.[33]   Several days later, Mr. Griffith sent a series of text messages to Mr. Schouten at approximately 5:04 a.m. on April 23, 2019 (the "*5:04 a.m. Text Message*").[34]   In his 5:04 a.m. Text Message, Mr. Griffith confirmed that he had received Mr. Schouten's voicemail messages, and he also wrote, "I am not getting mail to [the Sanguinet Address] I am at [the Geddes Address]."[35]   Mr. Schouten sent a reply text to Mr. Griffith a few hours later at 8:34 a.m., indicating that he had tried calling Mr. Griffith.[36]   Shortly thereafter, at approximately 8:45 a.m., Mr. Griffith and Mr. Schouten spoke by telephone (the "*April 23 Telephone Call*").[37]   What was discussed between Mr. Griffith and Mr. Schouten during the April 23 Telephone Call, however, is disputed.

Mr. Griffith testified that his motive for sending the 5:04 a.m. Text Message was to inquire about the status of his Note and possible foreclosure sale of the Property,[38] and to provide Lone Star written notification of his change of address to the Geddes Address.[39]   Mr. Griffith had separated from his spouse in the spring of 2019 and had moved back to the Geddes Address.[40]   Finally, Mr. Griffith denies that he and Mr. Schouten discussed changing his notice address during the April 23 Telephone Call.[41]

---

[33] Pl.'s Ex. 3 at 1; *see also* LS Ex. 8 at 1.

[34] Pl.'s Ex. 3 at 1; *see also* LS Ex. 8 at 1.

[35] Pl.'s Ex. 3 at 1; *see also* LS Ex. 8 at 1.

[36] Pl.'s Ex. 3 at 1; *see also* LS Ex. 8 at 1.

[37] Schouten Test. Tr., Adv. ECF No. 119, at 24:10-17; *see also* Griffith Test. Tr., Adv. ECF No. 118, at 50:9-15.

[38] Griffith Test. Tr., Adv. ECF No. 118, at 48:6-25.

[39] *Id.* at 46:24-47:3, at 48:2-5, and at 49:23-50:1.

[40] *Id.* at 46:17-47:3.

[41] *Id.* at 50:20-51:12.

Mr. Schouten, on the other hand, denied that Mr. Griffith's 5:04 a.m. Text Message was a written request by Mr. Griffith to change his notice address to the Geddes Address.[42] But even if Mr. Griffith's 5:04 a.m. Text Message could be construed as a written request to change his notice address to the Geddes Address, Mr. Schouten testified that during the subsequent April 23 Telephone Call, Mr. Griffith specifically requested that his notice address be changed to PO Box 101509, Fort Worth, TX 76185 (the "*PO Box*").[43] Mr. Schouten testified credibly that he had not heard of the PO Box until Mr. Griffith told him about it during the April 23 Telephone Call.[44] To corroborate his recollection of the April 23 Telephone Call, Mr. Schouten points to several contemporaneously created Lone Star business documents.[45]

First, immediately following the April 23 Telephone Call, Mr. Schouten drafted an internal *Memorandum*[46] to document his conversation with Mr. Griffith.[47] The Memorandum provides, in part, that "[w]hile on the phone Ray did request to update his address to PO Box 101509, Fort Worth, TX 76185-1509."[48]

Second, Mr. Schouten identified a *Customer Information Change Form*,[49] which is a document Lone Star uses in the ordinary course of its business to update a customer's information in Lone Star's business records.[50] This change form was prepared at 9:05 a.m. on April 23, 2019

---

[42] Schouten Test. Tr., Adv. ECF No. 119, at 23:1-17.

[43] *Id.* at 25:6-15.

[44] *Id.* at 25:8-13.

[45] *Id.* at 26:10-35:14.

[46] LS Ex. 9.

[47] Schouten Test. Tr., Adv. ECF No. 119, at 27:1-10.

[48] LS Ex. 9.

[49] LS Ex. 49, at 1-2.

[50] Schouten Test. Tr., Adv. ECF No. 119, at 29:6-11.

by Ms. Tori Owens, a Lone Star loan administrator, to reflect the change of notice address for Mr. Griffith's loan.[51]

Third, at 9:20 a.m. on April 23, 2019, Ms. Sargol Hilliard, a Lone Star loan Officer, verified the change of notice address and then prepared a *Loan Action Form*[52] to change Mr. Griffith's notice address in Lone Star's Cardinal loan maintenance system.[53]   After the completion of the above actions, Mr. Griffith's notice address in Lone Star's loan maintenance system was the PO Box.[54]

The Court finds the testimony of Mr. Schouten and the corroborating business record exhibits that were contemporaneously created by Mr. Schouten, Ms. Owens, and Ms. Hilliard more credible and more persuasive than Mr. Griffith's testimony that he had not orally requested to change his notice address to the PO Box.   And as discussed next, at no time after April 23, 2019 did Mr. Griffith ever raise any concerns to Lone Star that that he was receiving mail from Lone Star at his PO Box rather than at his Geddes Address.

### 5.  *Mr. Griffith Forwards His Mail from the Sanguinet Address to the PO Box*

When Mr. Griffith became divorced from his wife in 2019, he sent a forwarding notice to the United States Postal Service for all his mail to be forwarded from the Sanguinet Address to the PO Box.[55]

---

[51] LS Ex. 49 at 3; Schouten Test. Tr., Adv. ECF No. 119, at 32:3-20.

[52] LS Ex. 49, at 3-5.

[53] Schouten Test. Tr., Adv. ECF No. 119, at 33:1-34:8.

[54] *Id.* at 35:6-17.

[55] Griffith, Test. Tr., Adv. ECF No. 118, at 67:4-12, and at 192:16-17.

### 6. *Lone Star Notices Sent to Mr. Griffith's PO Box*

From and after April 23, 2019, Lone Star sent the following notice communications for Mr. Griffith to the PO Box.[56]

#### i. *Monthly Account Statements*

Lone Star mailed Mr. Griffith's following monthly statements to the PO Box:

- May 13, 2019[57]
- May 28, 2019[58]
- June 11, 2019[59]
- July 12, 2019[60]
- August 12, 2019[61]
- September 11, 2019[62]
- October 14, 2019[63]

Mr. Griffith did not raise any concerns to Lone Star that these monthly statements were sent to his PO Box rather than to his Geddes Address.

#### ii. *June 2019 Foreclosure Sale Notice*

On May 6, 2019, Lone Star sent its *Notice of Substitute Trustee's Sale*[64] (the "***June 2019 Foreclosure Sale Notice***") by both first-class mail and certified mail to the PO Box.[65]  The first-class mail was not returned as undeliverable, and the certified mail was returned as unclaimed—but not because of a bad address.[66]  Mr. Schouten testified credibly that it is common for certified

---

[56] Schouten Test. Tr., Adv. ECF No. 119, at 35:15-20.

[57] LS Ex. 38.

[58] LS Ex. 39.

[59] LS Ex. 40.

[60] LS Ex. 41.

[61] LS Ex. 42.

[62] LS Ex. 43.

[63] LS Ex. 44.

[64] LS Ex. 10, at 1.

[65] Schouten Test. Tr., Adv. ECF No. 119, at 35:25-36:13; *see also* SF ¶ 4.6.

[66] Schouten Test. Tr., Adv. ECF No. 119, at 37:6-13.

mail to be returned as unclaimed (as opposed to undeliverable) when such notices are also sent by first-class mail. In Mr. Schouten's experience, when many customers receive the same notice by first-class mail, they ignore the green card that signifies they have certified mail to pick up.[67] Mr. Griffith did not raise any concerns to Lone Star that the June 2019 Foreclosure Sale Notice was sent to his PO Box rather than to his Geddes Address.

Prior to the scheduled June 4, 2019 foreclosure sale, however, Mr. Griffith agreed to the appointment of a receiver to sell the Property in his divorce case.[68] Therefore, Lone Star did not proceed with the June 4, 2019 foreclosure sale. A month later, Mr. Griffith agreed to the dissolution of the receivership in his divorce case without the Property having been sold.[69] The receiver was awarded a judgment against Mr. Griffith in the amount of $6,000.[70]

> iii. *November 2019 Foreclosure Sale Notice*

In October 1, 2019, Mr. Griffith met in person with Mr. Matthew Curtis James ("***Mr. James***"), the chief lending officer for Lone Star.[71] During this meeting, Mr. James informed Mr. Griffith that Lone Star would be posting the Property for a November 2019 foreclosure sale, and that Mr. Griffith would be receiving the notices.[72] Thereafter, on October 7, 2019, Lone Star sent its *Notice of Substitute Trustee's Sale*[73] (the "***November 2019 Foreclosure Sale Notice***") to Mr.

---

[67] *Id.* at 37:2-38:3 and at 68:2-19.

[68] LS Ex. 12.

[69] LS Ex. 13.

[70] *Id.*

[71] James Test. Tr., Adv. ECF No. 120, at 32:18-19. Mr. Griffith testified that he called on Mr. James on or about November 4, 2019. *See* Griffith Test. Tr., Adv. ECF No. 118, at 52:13-53:11. But Mr. James testified that the meeting took place on October 1, 2019 as opposed to November 4, 2019, and that testimony is corroborated by a text message. *See* LS Ex. 23 at 1.

[72] James Test. Tr., Adv. ECF No. 120, at 34:11-12.

[73] LS Ex. 14.

Griffith by both first-class mail and certified mail to the PO Box.[74] The first-class mail was not returned as undeliverable, and the certified mail was returned as unclaimed—but not because of a bad address.[75] Mr. Griffith did not raise any concerns to Lone Star that he had not received the November 2019 Foreclosure Sale Notice or that it been sent to his PO Box rather than to his Geddes Address.

Prior to the scheduled November 5, 2019 foreclosure sale, Mr. Griffith filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code (the "***Bankruptcy Petition***").[76] Due to the § 362 automatic stay in Mr. Griffith's bankruptcy case, the November 5, 2019 scheduled foreclosure sale did not occur.

### 7. *Wells Fargo Sends Notice of Release of Lien to the PO Box*

Additional evidence suggests that Mr. Griffith used the PO Box for personal use. On or about December 19, 2019, Wells Fargo sent a *Release of Lien* regarding the Sanguinet home owned by Mr. Griffith and his former spouse.[77] The Release of Lien provides, in pertinent part, "[s]aid Deed of Trust/Mortgage . . . executed by Ray Griffith and Susan Griffith . . . whose mailing address is PO Box 101509, Fort Worth, TX 76185."[78] Mr. Griffith denied having informed Wells Fargo about his PO Box,[79] but the Court does not find Mr. Griffith's testimony on this point credible or persuasive.

---

[74] Schouten Test. Tr., Adv. ECF No. 119, at 46:25-47:20; *see also* SF ¶ 4.8.

[75] Schouten Test. Tr., Adv. ECF No. 119, at 47:24-48:5.

[76] Case No. 19-44562, ECF No. 1.

[77] LS Ex. 48.

[78] *Id.*

[79] Griffith Test. Tr., Adv. ECF No. 118, at 101:21-103:21.

**C. Mr. Griffith's Bankruptcy Filing, Dismissal, and Reinstatement, and Lone Star's Foreclosure During the "Gap" Period**

Although Mr. Griffith filed his Bankruptcy Petition on November 4, 2019, he failed to file several required documents, such as his Schedules, Statement of Financial Affairs, proposed Chapter 13 Plan, and other necessary documents (the "***Required Bankruptcy Documents***").[80] On November 19, 2019, Mr. Griffith filed a motion seeking an extension of time to file his Required Bankruptcy Documents,[81] which the Court granted, extending the deadline to December 2, 2019.[82] Mr. Griffith failed to file his Required Bankruptcy Documents by the extended December 2, 2019 deadline, however, so Mr. Griffith's Chapter 13 bankruptcy case was dismissed on December 4, 2019.[83] On December 9, 2019, Mr. Griffith filed a motion to reinstate his bankruptcy case.[84]

Because Mr. Griffith's Chapter 13 bankruptcy case was dismissed and had not yet been reinstated, on December 9, 2019, Lone Star sent its *Notice of Substitute Trustee's Sale*[85] (the "***January 2020 Foreclosure Sale Notice***") by both first-class mail and certified mail to the PO Box.[86] The first-class mail was not returned as undeliverable, and the certified mail was returned as unclaimed—but not because of a bad address.[87] Mr. Griffith testified that he never actually saw the January 2020 Foreclosure Sale Notice nor did he have any knowledge that the Property was scheduled for a January 7, 2020 foreclosure sale.[88]

---

[80] Case No. 19-44562, ECF No. 4.

[81] Case No. 19-44562, ECF No. 11.

[82] Case No. 19-44562, ECF No. 12.

[83] Case No. 19-44562, ECF No. 14; *see also* LS Ex. 25.

[84] Case No. 19-44562, ECF No. 16; *see also* LS Ex. 26.

[85] LS Ex. 15.

[86] Schouten Test. Tr., Adv. ECF No. 119, at 49:19-50:3; *see also* SF ¶ 4.13.

[87] Schouten Test. Tr., Adv. ECF No. 119, at 50:7-17.

[88] Griffith Test. Tr., Adv. ECF No. 118, at 58:15-17, and at 59:13-17.

On January 7, 2020, Lone Star conducted a foreclosure sale and sold the Property to Ms. Matulich.[89]

On January 8, 2020, Mr. Griffith filed the Required Bankruptcy Documents.[90] Thereafter, on January 14, 2020, the Court entered its *Agreed Order Reinstating Case*.[91]

On January 15, 2020, Lone Star sent a *Notice of Foreclosure Sale and Remission of Excess Proceeds* letter (the "***Excess-Proceeds Letter***") by first-class mail and certified mail to Mr. Griffith at the Geddes Address.[92] The Excess-Proceeds Letter enclosed several documents, including Check #66055 made payable to Mr. Griffith in the amount of $2,738.70.[93] The Check also referenced Mr. Griffith's address as the Geddes Address as opposed to the PO Box.[94] Lone Star also sent a copy of the Excess-Proceeds Letter and its enclosures by first-class mail to the PO Box, which Mr. Griffith admitted receiving at the PO Box.[95]

On January 29, 2020, Lone Star sent a letter for Mr. Griffith to the PO Box, enclosing a release of lien and confirming that the Note had been paid in full.[96]

## D. Adversary Proceeding and Summary-Judgment Filings

On May 18, 2020, Mr. Griffith filed his Complaint and commenced this adversary proceeding.[97] The Complaint contained six counts:

---

[89] LS Ex. 16 at 2.

[90] Case No. 19-44562, ECF Nos. 18, 20, 21, and 22.

[91] Case No. 19-44562, ECF No. 23; *see also* LS Ex. 28.

[92] Pl.'s Ex. 9; *see also* LS Ex. 17.

[93] Pl.'s Ex. 9; *see also* LS Ex. 17.

[94] LS Ex. 17 at 21.

[95] Griffith Test. Tr., Adv. ECF No. 118, at 62:1-63:4.

[96] LS Ex. 46 at 2.

[97] Adv. ECF No. 1.

**Count One**:    Avoidance of Preferential Transfer Under 11 U.S.C. § 547(b)

**Count Two**:    Fraudulent Transfer Under 11 U.S.C. § 548

**Count Three**: Fraudulent Transfer Under 11 U.S.C. § 544[98] and Chapter 24 of Tex. Bus. & Comm. Code

**Count Four:**  Avoidance of Postpetition Transfer Under 11 U.S.C. § 549

**Count Five:**  Violation of Automatic Stay Under 11 U.S.C. § 362

**Count Six**:    Wrongful Foreclosure in Breach of Contract

On October 8 and 9, 2020, Lone Star and Ms. Matulich each filed summary-judgment motions,[99] and the parties then filed their respective responses, replies, and appendices.

On January 13, 2021, the Court entered its (a) *Order Granting in Part and Denying in Part Lone Star, FLCA's Motion for Summary Judgment* (the "***Lone Star Summary-Judgment Order***"),[100] and (b) *Order Granting Motion of Crystal Matulich for Summary Judgment* (the "***Matulich Summary-Judgment Order***,"[101] and together with the Lone Star Summary-Judgment Order, the "***Summary-Judgment Orders***"), pursuant to which the Court dismissed all Mr. Griffith's claims except for the breach of contract claim included in Count Six of the Complaint.

On March 17, 2021, however, the Court entered its *Order Granting in Part and Denying in Part Motion for Reconsideration of Summary Judgment Orders and for Leave to Amend Complaint*,[102] pursuant to which the Court (a) reconsidered and amended the Summary-Judgment Orders such that the wrongful-foreclosure claim in Count Six was not dismissed; and (b) denied Mr. Griffith's request to file an amended complaint to assert a new cause of action and to assert a

---

[98] The Complaint cites to § 546, but the Court assumes Mr. Griffith intended to cite § 544.

[99] Adv. ECF Nos. 17 (Ms. Matulich, filed October 8, 2020), 20 (Lone Star, filed October 9, 2020).

[100] Adv. ECF No. 50.

[101] Adv. ECF No. 51.

[102] Adv. ECF No. 79.

jury demand.[103]  Therefore, the trial was held on Mr. Griffith's Counts for Breach of Contract and Wrongful Foreclosure.

## IV.    CONCLUSIONS OF LAW AND ANALYSIS

The Court must address each party's claims, counterclaims, and crossclaims.

### A.  Mr. Griffith's Claims Against Lone Star and Ms. Matulich

Where an alleged breach arises from a deed of trust, Texas law seems to allow both a claim for wrongful foreclosure and a claim for breach of contract.[104]  Count Six of the Complaint, as construed by this Court, contains two causes of action stemming from Lone Star's alleged failure to provide Mr. Griffith with proper notice of the Foreclosure required by Texas law and the Deed of Trust:  (1) breach of contract, and (2) wrongful foreclosure.  The Court will address each in turn.

### 1.    Breach of Contract[105]

Under Texas law, an allegation of a breach of a deed of trust is synonymous with a breach of contract claim,[106] and the plaintiff must show:  (i) the existence of a valid contract; (ii) performance or tendered performance by the plaintiff; (iii) breach by the defendant; and (iv) damages sustained by the plaintiff as a result of the breach.[107]  For the reasons explained below, Mr. Griffith failed to establish the element of breach by the defendant, so the Court's breach-of-contract analysis begins and ends with that issue.

---

[103] *Id.*

[104] *See Sauceda v. GMAC Mortg. Corp.*, 268 S.W.3d 135, 139-40 (Tex. App.—Corpus Christi Aug. 26, 2008, no pet.)

[105] Ms. Matulich is not a party to any contract with Mr. Griffith, but Mr. Griffith appears to seek relief against Ms. Matulich based on Lone Star's alleged breach of the Deed of Trust.

[106] *Daniels v. Regions Bank*, No. 4:19-cv-00416-P, 2019 WL 4735800, at *3 (N.D. Tex. Sep. 27, 2019) (citing *Williams v. Wells Fargo Bank, N.A.*, 884 F.3d 239, 244 (5th Cir. 2018)).

[107] *R&L Inv. Property, LLC v. Green*, No. 3:12–cv–4171–O, 2014 WL 1807618, at *6 (N.D. Tex. May 6, 2014) (citing *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009)).

The Court construes Mr. Griffith's arguments as pointing to two potential breaches of contract: Breach of paragraph 27 of the Deed of Trust and breach of paragraph 16 of the Deed of Trust.

     i.     *Alleged Breach of Paragraph 27 of the Deed of Trust*

As noted above, paragraph 27 of the Deed of Trust provides that Lone Star shall give notice to Mr. Griffith by delivering it or by mailing it by first class mail to the Geddes Address "or to any other address designated in writing."[108] Mr. Griffith argues that Lone Star breached paragraph 27 of the Deed of Trust by failing to send the January 2020 Sale Notice to the Geddes Address, which is the last address Mr. Griffith designated in writing (pursuant to his 5:04 a.m. Text Message). In response, Lone Star asserts two independent arguments.

     (a) Lone Star Contends It Complied with the Express Terms of the Deed of Trust

First, Lone Star argues that it was not required to send the January 2020 Sale Notice to the Geddes Address under the express terms of the Deed of Trust. In support of this argument, Lone Star asserts the following four independent arguments, each of which the Court finds unpersuasive:

- First, paragraph 16 of the Deed of Trust ("Remedies on Default") is the more specific and controlling provision that requires that Lone Star give notice of a foreclosure sale "as required by the applicable law,"[109] which under Texas Property Code section 51.002(b)(3) and (e)[110] means sending notice by certified mail to Mr. Griffith's last known address (*i.e.*, the PO Box). According to Lone Star, paragraph 16—not paragraph 27—controls in the event of a default, and Lone Star complied

---

[108] LS Ex. 2 ¶ 27.

[109] LS Ex. 2 ¶ 16.

[110] TEX. PROP. CODE § 51.002(b)(3) (requiring notice of foreclosure sale to be served by certified mail on the debtor); TEX. PROP. CODE § 51.002(e) (providing that service of foreclosure notice by certified mail is complete when deposited into the U.S. mail, postage prepaid, and addressed to the debtor at the debtor's last known address).

with paragraph 16 by sending the January 2020 Sale Notice by certified mail to the PO Box.[111] Stated differently, Lone Star argues that it did not need to comply with paragraph 27 because that paragraph allegedly does not apply in default situations.

- Second, even if paragraph 27 of the Deed of Trust is the controlling provision, that paragraph requires that Lone Star send notices to the Geddes Address or to any other address designated in writing, "[u]nless otherwise required by law," and Lone Star was "otherwise required" by Texas Property Code section 51.002(e) to send a foreclosure notice by certified mail to Mr. Griffith's last known address (*i.e.*, the PO Box).

- Third, the Deed of Trust and Note were executed at the same time and should be construed together, and the Note requires that Lone Star send notices by first class mail to Mr. Griffith's last known address (*i.e.*, the PO Box). According to Lone Star, it complied with the Note by sending the January 2020 Sale Notice by certified mail and by first class mail to the PO Box.

- Fourth, the Note requires Mr. Griffith "to inform [Lone Star] in writing of any change in [Mr. Griffith's] address."[112] Because Mr. Griffith did not perform that obligation by informing Lone Star in writing of the change to the PO Box, paragraph 12 of the Deed of Trust (argues Lone Star) authorized Lone Star to perform the obligation for him. Lone Star performed Mr. Griffith's obligation in its April 23, 2019 internal memorandum by designating the PO Box in writing as

---

[111] The Court addresses the separate alleged breach of paragraph 16 of the Deed of Trust below under the heading, "b) Alleged breach of Paragraph 16 of the Deed of Trust." In this part of the Order, the Court is simply addressing Lone Star's argument that paragraph 16—and not paragraph 27—applies. As noted below, Lone Star must comply with *both* provisions.

[112] LS Ex. 1, at 2 ("NOTICE").

Mr. Griffith's address. According to Lone Star, it thus sent the January 2020 Sale Notice to the applicable address "designated in writing" within the meaning of Deed of Trust paragraph 27.

As previously noted, the Court disagrees with each of Lone Star's arguments that it complied with the express terms of the Deed of Trust. Lone Star was required to comply not only with applicable law (including the Texas Property Code, addressed in further detail below), but also with Deed of Trust paragraph 27, which required Lone Star to provide notice to either the Geddes Address or such other address designated by Mr. Griffith (not Lone Star) in writing.

> (b) Mr. Griffith Waived the Requirement in the Deed of Trust that Notice Be Sent to Either the Geddes Address or "any other address designated in writing"

Second, Lone Star argues that even if it failed to comply with the *express* terms of paragraph 27 of the Deed of Trust, Mr. Griffith waived the requirement in the Deed of Trust that Lone Star send notice to the Geddes Address or such other address that Mr. Griffith provides in writing. For the reasons detailed below, the Court finds and concludes that Lone Star's waiver argument is persuasive.

"The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right."[113] Although a party may waive a contractual right through a course of conduct that lasts for years,[114] a party may also waive a

---

[113] *Thompson v. Bank of Am. Nat. Ass'n*, 783 F.3d 1022, 1025 (5th Cir. 2015) (citing *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008)).

[114] *See, e.g., Tenneco Inc. v. Enter. Prod. Co.*, 925 S.W.2d 640, 643 (Tex. 1996) (parties to natural gas plant operating agreement waived contractual rights restricting ownership transfers after knowing of transfer that violated contractual restriction and remaining silent for three years: "Silence or inaction, for so long a period as to show an intention to yield the known right, is also enough to prove waiver."); *Tollett v. MPI Surface, LLC*, No. 05-17-00435-CV, 2018 WL 2926356, at *5 (Tex. App.—Dallas June 8, 2018, no pet.) (party to groundwater contract waived the royalty payment and metering provisions of the agreement by failing to complain about known performance failures for four years).

contractual right through conduct that occurs over a relatively short period.[115] No matter how long the period of conduct lasts, the central element is intent, which must be unequivocally manifested.[116] Where waiver is claimed by inference rather than express renunciation, the party who is to benefit must produce conclusive evidence that the opposite party unequivocally manifested its intent to no longer assert its claim.[117]

Here, Lone Star has satisfied its burden to establish that Mr. Griffith—through both express renunciation and through inference—waived his right to have Lone Star send notice to either the Geddes Address "or to any other address designated in writing."

First, as found above, Mr. Griffith twice made an express change-of-address request to Lone Star verbally over the phone. On March 26, 2014, Mr. Griffith telephoned Lone Star to change his address from the Geddes Address to the Sanguinet Address. And during the critical April 23 Telephone Call, Mr. Griffith verbally and expressly asked Mr. Schouten to send notices to Mr. Griffith's PO Box rather than to the Geddes Address.

Second, as found above, Mr. Griffith received the June 2019 Foreclosure Sale Notice at the PO Box and never raised any concerns to Lone Star that such notices should be sent to the Geddes Address instead.

---

[115] *See, e.g., Vlasak for Silber Fam. Trust v. Taxco, Inc.*, No. 01-16-00191-CV, 2017 WL 2952351, at *7 (Tex. App.–Houston [1st Dist.] July 11, 2017, no pet.) (party to sale agreement waived timely performance of December 29 closing deadline when its president orally communicated with title insurer into January that his company was still ready, willing, and able to close); *Alford, Meroney & Co. v. Rowe*, 619 S.W.2d 210, 213-15 (Tex. Civ. App.—Amarillo 1981, writ ref'd n.r.e.) (accounting firm waived right in partnership agreement to enforce penalty provision against withdrawing partner who competed against the firm; over course of one month, firm (a) never replied to partner's pre-withdrawal request to withdraw and compete against firm without penalty; and (b) notified all employees that partner was withdrawing).

[116] *Thompson*, 783 F.3d at 1025; *see also Hartford Life & Annuity Ins. Co. v. Unsell,* 144 U.S. 439, 448 (1892) ("Of course we speak by our actions, just as much as we do by our words; and although there may be no spoken word, no written word, declaring a waiver, yet it may be that a man by his conduct, his course of dealing, justly and fairly leads the other party to believe that he does not care about a strict compliance.").

[117] *Thompson*, 783 F.3d at 1025.

Third, as found above, Mr. Griffith received the November 2019 Foreclosure Sale Notice at the PO Box and never raised any concerns to Lone Star that such notices should be sent to the Geddes Address instead.

Fourth, as found above, after the April 23 Telephone Call with Mr. Schouten, Mr. Griffith started receiving monthly bank statements at the PO Box. At least seven bank statements were sent to Mr. Griffith at the PO Box, yet Mr. Griffith never raised any concerns to Lone Star that such bank statements should be sent to the Geddes Address instead.

Based on Mr. Griffith's express verbal request to receive notices at the PO Box, as well as his actual knowledge (without complaint) that Lone Star was sending multiple business and legal notices (including two prior foreclosure notices) to the PO Box after the April 23 Telephone Call with Mr. Schouten, Mr. Griffith waived any requirement in the Deed of Trust that Lone Star send the January 2020 Sale Notice to the Geddes Address.

To avoid this straightforward conclusion, Mr. Griffith makes two related arguments, neither of which is persuasive.

First, Mr. Griffith argues that any oral request he made to change his notice address under the Deed of Trust is unenforceable under the Statute of Frauds, as codified by Texas Business and Commerce Code section 26.02(b). Under that statute, "A loan agreement in which the amount involved in the loan agreement exceeds $50,000 in value is not enforceable unless the agreement is in writing and signed by the party to be bound or by that party's authorized representative."[118] Mr. Griffith attempts to use the Statute of Frauds to defeat an argument that Lone Star is not making, however. Lone Star is not arguing that the parties agreed by contract to modify the terms of the Deed of Trust. If that were Lone Star's argument, then Mr. Griffith may be correct that an

___
[118] TEX. BUS. & COM. CODE § 26.02(b).

attempt to contractually modify the terms of an existing agreement, to which the Statute of Frauds applies, must also comply with the Statute of Frauds.[119]  Rather, Lone Star is arguing that there is only one relevant agreement (the Deed of Trust), and that Mr. Griffith waived his right under that agreement to receive notice at the Geddes Address or to any other address designated in writing. There are multiple cases applying Texas waiver law to deeds of trust, strongly suggesting that in Texas, a party can waive its rights under a deed of trust that otherwise is subject to the Statute of Frauds.[120]  Here, through both express renunciation and through inference, Mr. Griffith waived his right to have Lone Star send notice of the Foreclosure to the Geddes Address or to any other address designated in writing.

Second, Mr. Griffith argues that any oral request he made to change his notice address under the Deed of Trust is unenforceable because the Deed of Trust has a no-oral-modification clause.[121]  Texas courts generally allow oral modifications to an agreement notwithstanding no-oral modification-clauses, reasoning that the written agreement is of no higher legal degree than an oral one, and either may vary or discharge the other.[122]  The exception to that rule is when the contract itself is subject to the Statute of Frauds.[123]  But as noted above, Lone Star is not arguing that the parties agreed by contract to modify the terms of the Deed of Trust; Lone Star argues

---

[119] *In re Artho*, 587 B.R. 866, 881 (Bankr. N.D. Tex. 2018).

[120] *See, e.g., Thompson*, 783 F.3d at 1025-26 (applying test for waiver of rights in Texas and concluding that bank, by postponing foreclosure 12 times, did not intend to waive its rights under a deed of trust to foreclose); *Alli v. Wachovia Bank, N.A.*, No. 01-11-00800-CV, 2013 WL 772946, at *3–5 (Tex. App.–Houston [1st Dist.] Feb. 28, 2013, no pet.) (applying test for waiver of rights in Texas and concluding that bank, through its conduct in communicating with debtor's agent, did not intend to waive deed of trust requirements for providing notice of a foreclosure); *Longview Sav. & Loan Ass'n v. Nabours*, 673 S.W.2d 357, 361 (Tex. App.–Texarkana June 12, 1984) (applying test for waiver of rights in Texas and affirming jury finding that lender waived its right to foreclose through its conduct), *writ granted* (Jan. 30, 1985), *aff'd*, 700 S.W.2d 901 (Tex. 1985).

[121] LS Ex. 2 ¶ 25 ("This Security Instrument may not be amended or modified by oral agreement.").

[122] *See, e.g., Am. Garment Properties, Inc. v. CB Richard Ellis-El Paso, L.L.C.*, 155 S.W.3d 431, 435 (Tex. App.—El Paso Oct. 28, 2004, no pet.) (collecting cases).

[123] *Id.* at 435-36.

instead that Mr. Griffith waived his rights under that document. For the reasons already explained, the Court agrees with Lone Star. Just as Mr. Griffith waived his right under paragraph 27 of the Deed of Trust to have Lone Star send notice to the Geddes Address or to any other address designated in writing, Mr. Griffith also waived the no-oral-modification clause in paragraph 25 of the Deed of Trust.[124]

Because Mr. Griffith waived any requirement in the Deed of Trust that Lone Star send notice to the Geddes Address or to any other address designated in writing, Lone Star did not breach paragraph 27 of the Deed of Trust by sending the January 2020 Sale Notice by first class mail and certified mail to the PO Box.

### ii.    *Alleged breach of Paragraph 16 of the Deed of Trust*

Paragraph 16 of the Deed of Trust ("Remedies on Default") requires that Lone Star give notice of a foreclosure sale "as required by the applicable law,"[125] which under the Texas Property Code means sending notice of a foreclosure sale by certified mail to Mr. Griffith's last known address.[126] Mr. Griffith argues that the Geddes Address—not the PO Box—was Mr. Griffith's last known address and that Lone Star breached paragraph 16 by not mailing the January 2020 Sale Notice to the Geddes Address as required by the statute. The Court disagrees.

Under the Texas Property Code, for a debt secured by the debtor's nonresidence property, "Debtor's last known address" means "the debtor's last known address as shown by the records of the mortgage servicer of the security instrument unless the debtor provided the current mortgage servicer a written change of address before the date the mortgage servicer mailed a notice required

---

[124] *Cf. Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 482–83 (Tex. 2017) (affirming that a party's rights under a nonwaiver provision may indeed be waived expressly or impliedly).

[125] LS Ex. 2 ¶ 16.

[126] TEX. PROP. CODE § 51.002(b)(3) (requiring that notice of foreclosure sale be provided by certified mail to the debtor); TEX. PROP. CODE § 51.002(e) (providing that service of foreclosure notice by certified mail is complete when notice is deposited in U.S. mail, postage prepaid, and addressed to debtor at debtor's "last known address").

by Section 51.002."[127] The statute further provides, "A debtor shall inform the mortgage servicer of the debt in a reasonable manner of any change of address of the debtor for purposes of providing notice to the debtor under Section 51.002."[128]

On April 23, 2019, after Mr. Griffith verbally told Mr. Schouten to send notices to the PO Box, Lone Star updated its internal records to reflect the PO Box as Mr. Griffith's address.[129] The PO Box thus became Mr. Griffith's "last known address" unless Mr. Griffith "provided [Lone Star] a written change of address before the date" Lone Star mailed the foreclosure notice.[130] Mr. Griffith had an obligation to inform Lone Star "in a reasonable manner"[131] of any change of address from the PO Box.

Mr. Griffith first argues that the Geddes Address was his last known address because he provided notice of that address to Lone Star in his 5:04 a.m. Text Message. Only a few hours later, however, Mr. Griffith changed his notice address verbally during the April 23 Telephone Call to the PO Box, and Lone Star updated its internal records immediately to reflect the PO Box as Mr. Griffith's address.[132] The PO Box was Mr. Griffith's last known address unless he provided Lone Star a change of address after the April 23 Telephone Call. Mr. Griffith did not provide Lone Star with a change of address after the April 23 Telephone Call with Mr. Schouten.

Mr. Griffith next argues that the Geddes Address was his last known address because Lone Star received notice of Mr. Griffith's bankruptcy filing, and that November 7, 2019 notice (the

---

[127] TEX. PROP. CODE § 51.001(2)(B).

[128] TEX. PROP. CODE § 51.0021.

[129] LS Ex. 49.

[130] TEX. PROP. CODE § 51.001(2)(B).

[131] TEX. PROP. CODE § 51.0021.

[132] LS Ex. 49.

"**Bankruptcy Notice**") listed Mr. Griffith's address as the Geddes Address.[133] The Bankruptcy Notice, although populated with information supplied by Mr. Griffith, was mailed by the Bankruptcy Court Clerk's Office to Lone Star's headquarters at 1612 Summit Avenue, #300, Fort Worth. This document—the purpose of which is to notify all creditors and parties-in-interest of a debtor's bankruptcy filing and of certain key dates, such as the § 341 meeting of creditors and the proof-of-claim deadline—cannot reasonably be construed as a notice to Lone Star of a change of Mr. Griffith's address *for purposes of the Deed of Trust*. Moreover, even if the Bankruptcy Notice could somehow be construed as a technical change-of-address form, Mr. Griffith did not inform Lone Star of this change "in a reasonable manner."[134]

Mr. Griffith finally argues that Lone Star recognized the Geddes Address as his last known address because after the January 7, 2020 foreclosure sale, Lone Star sent certain documents to Mr. Griffith at the Geddes Address: (a) the Excess-Proceeds Letter was addressed to Mr. Griffith at the Geddes Address;[135] (b) the check for $2,738.70 enclosed with the Excess-Proceeds Letter payable to Mr. Griffith at the Geddes Address;[136] and (c) a 2020 IRS Form 1099-MISC addressed to Mr. Griffith at the Geddes Address.[137] Mr. Schouten testified credibly, however, that (a) Lone Star's outside counsel mistakenly inserted the Geddes Address (rather than the PO Box) into the Excess-Proceeds Letter, and Mr. Schouten did not catch the mistake;[138] (b) Lone Star's accounting department, when preparing the January 14, 2020 check, mistakenly pulled the Geddes Address

---

[133] Pl.'s Ex. 35 (Official Form 309 / Notice of Chapter 13 Bankruptcy Case).

[134] TEX. PROP. CODE § 51.0021.

[135] LS Ex. 17, at LS 087.

[136] LS Ex. 17, at LS 107. Lone Star also sent a copy of the Excess-Proceeds Letter and the check to the PO Box. *See* Schouten Test. Tr., Adv. ECF No. 119, 106:22-107:20.

[137] Pl.'s Ex. 23.

[138] Schouten Test. Tr., Adv. ECF No. 119, at 105:3-107:20.

from old W-9 forms from origination of the loan;[139] and (c) Lone Star's account department, when preparing the IRS Form 1099-MISC, likewise mistakenly pulled the Geddes Address from old W-9 forms from origination of the loan.[140]

For these reasons, Lone Star did not breach paragraph 16 of the Deed of Trust. Instead, Lone Star complied with paragraph 16 and the Texas Property Code by sending the January 2020 Sale Notice to Mr. Griffith's last known address—the PO Box.

### 2. *Wrongful Foreclosure*

Mr. Griffith must establish three elements for a wrongful foreclosure cause of action: (1) a defect in the foreclosure sale proceedings; (2) a grossly inadequate sale price; and (3) a causal nexus linking the alleged defect and the grossly inadequate sale price.[141] Essentially, there must be evidence of an irregularity in the sale process, and that irregularity "must have caused or contributed to cause the property to be sold for a grossly inadequate price."[142]

The only defect Mr. Griffith can identify is Lone Star's alleged failure under the Deed of Trust and the Texas Property Code to send the January 2020 Sale Notice to the Geddes Address. But as explained in detail above, Mr. Griffith waived any requirement under the Deed of Trust that Lone Star send such notice to the Geddes Address, and Lone Star complied with the statute by mailing the notice by first-class mail and certified mail to the PO Box, which was Mr. Griffith's last known address. Because Mr. Griffith failed to establish a defect in the foreclosure sale proceeding, his wrongful-foreclosure claim fails.

---

[139] *Id.* at 107:23-109:5.

[140] *Id.* at 61-62, and at 109:25-110:18.

[141] *See In re Keener*, 268 B.R. 912, 921 (Bankr. N.D. Tex. 2001) (analyzing Texas law); *In re Greenhaw Energy, Inc.*, 359 B.R. 636, 643 (Bankr. S.D. Tex. 2007) (citing *Bonilla v. Roberson*, 918 S.W.2d 17, 22 (Tex.App.—Corpus Christi Jan. 11, 1996, no pet.)).

[142] *Am. Savs. and Loan Ass'n of Houston v. Musick,* 531 S.W.2d 581, 587 (Tex. 1975).

**B. Lone Star's counterclaims against Mr. Griffith**

In its *Amended Answer with Affirmative and Other Defenses and Counterclaims*,[143] Lone Star pled two alternative counterclaims against Mr. Griffith that have now become moot.

First, "in the event the foreclosure sale is considered void or voidable and rescinded and set aside, Lone Star requests that the Court restore all of the parties to their original positions prior to the foreclosure sale" through a rescission claim.[144] Because the Foreclosure Sale is not void or voidable and will not be rescinded and set aside, Lone Star's contingent counterclaim for rescission is dismissed as moot.

Second, "if the foreclosure sale should be invalidated or set aside for any reason," Lone Star asserts a breach-of-contract counterclaim against Mr. Griffith, including a request for damages and attorney's fees.[145] Because the foreclosure sale will not be invalidated or set aside, Lone Star's contingent breach-of-contract counterclaim is dismissed as moot.

**C. Ms. Matulich's Counterclaims Against Mr. Griffith and Crossclaims Against Lone Star**

In her *Answer to Complaint, Counterclaim and Crossclaim*,[146] Ms. Matulich pled various contingent counterclaims and crossclaims that have now become moot.

First, "[t]o the extent that the foreclosure sale is set aside, Ms. Matulich should recover from Lone Star" under a breach-of-contract crossclaim, including a request for damages, attorney's fees, and interest.[147] Because the foreclosure sale will not be set aside, Ms. Matulich's contingent breach-of-contract crossclaim against Lone Star is dismissed as moot.

---

[143] Adv. ECF No. 15.

[144] *Id.* ¶¶ 18-21, at 8-9.

[145] *Id.* ¶¶ 22-26, at 9-10.

[146] Adv. ECF No. 29.

[147] *Id.* ¶¶ 38-39, at 7 ("CROSSCLAIM AGAINST LONE STAR").

Second, "[t]o the extent that the sale is considered void or voidable under any of the avoidance counts and the sale is rescinded and set aside," then the Court should restore the parties to their original positions through Ms. Matulich's crossclaim and counterclaim for rescission, including a return of the foreclosure purchase price to Ms. Matulich.[148] Because the sale is not considered void or voidable under any of Mr. Griffith's avoidance counts and the sale is not rescinded and set aside, Ms. Matulich's contingent crossclaim and counterclaim for rescission is dismissed as moot.

Third, "[t]o the extent that the Court orders that the sale be set aside under any theory advanced by the Debtor," and if the Court is unable to restore the purchase price to Ms. Matulich, then the Court should grant her (a) subrogation to the contract and lien rights of Lone Star and other secured creditors that were paid with the foreclosure proceeds; and (b) an equitable lien against the Property.[149] Because the foreclosure sale will not be set aside under any of Mr. Griffith's theories, Ms. Matulich's contingent counterclaim and crossclaim for subrogation/lien rights is dismissed as moot.

Finally, "[t]o the extent that the foreclosure sale was deemed a violation of the automatic stay, then equity requires that the parties be returned to their conditions prior to the voiding of the sale."[150] Because the foreclosure sale was not a violation of the automatic stay, Ms. Matulich's contingent counterclaim and crossclaim for this equitable relief is denied as moot.

---

[148] *Id.* ¶¶ 40-42, at 7-8 ("COUNTER AND CROSSCLAIM FOR RECISSION").

[149] *Id.* ¶¶ 43-44, at 8 ("COUNTER AND CROSSCLAIM FOR SUBROGATION").

[150] *Id.* ¶ 45, at 8-9 ("VIOLATION OF THE AUTOMATIC STAY").

## V. CONCLUSION

For the reasons stated above, it is hereby **ORDERED** as follows:

1.  Mr. Griffith's breach-of-contract and wrongful-foreclosure claims in Count Six of the Complaint are **DISMISSED WITH PREJUDICE**.

2.  Lone Star's contingent counterclaims for rescission and breach of contract are **DISMISSED AS MOOT**.

3.  Ms. Matulich's contingent counterclaims and crossclaims for breach of contract, rescission, subrogation and equitable lien, and equitable relief are **DISMISSED AS MOOT**.

4.  Except for consideration of attorney's fees and costs, which was reserved by the parties pending this ruling, all other relief requested by the parties, to the extent not already addressed in this Memorandum Opinion, is **DENIED**.

5.  This Memorandum Opinion is not a final order or judgment and is not immediately appealable. The Court will enter a separate final judgment consistent with this Memorandum Opinion after quantification of any attorney's fees and costs award that the Court may issue (or decline to issue) through post-trial procedures under Federal Civil Rule 54(d).

6.  Within seven business days after the entry of this Memorandum Opinion, the parties shall meet and confer and either (a) upload an agreed scheduling order for the disposition of any request for attorney's fees and costs; or (b) file a notice with the Court stating that either (i) the parties are unable to agree on the terms of the agreed scheduling order, or (ii) no party will be filing a request for attorney's fees and costs.

### ### END OF MEMORANDUM OPINION ###

30